IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                                         CR 14-2563 MCA

MELVIN RUSSELL,

        Defendant.

**DEFENDANT MELVIN RUSSELL'S FIRST MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF SANE NURSE EXAMINER SUSAN ELDRED**

COMES NOW, Defendant Melvin Russell, by his appointed CJA counsel, Mark H. Donatelli and Paul M. Linnenburger of Rothstein Donatelli LLP, and, pursuant to U.S. Const. amend V; U.S. Const. amend. VI; U.S. Const. amend. XIV; *Crawford v. Washington*, 541 U.S. 36 (2004); Fed. R. Evid. 801; and Fed. R. Evid. 803, and hereby requests this Court exclude the proposed testimony of Nurse Susan Eldred at trial concerning any statements made to her:

I.     INTRODUCTION AND FACTUAL BACKGROUND

    A.    Introduction

On the evening of May 20, 2014, the alleged victim (C.E.) appeared at the San Juan Regional Medical Center in Farmington, New Mexico ("SJRMC"). She was extremely intoxicated and immediately demanded a sexual assault examination. Hours later, Susan Eldred of the Sexual Assault Services of North West New Mexico "examined" C.E. in accordance with her "emphatic" demands.

The United States now proposes Eldred "will testify regarding to [*sic*] the contents of her

report and examination of [C.E.]," including numerous statements provided by C.E. to Eldred.[1] (Doc. 76, p. 2). Defendant Russell submits that any proposed testimony of Eldred in regards to statements from C.E. is inadmissible hearsay and any admission thereof would violate his confrontation rights. The circumstances of the SANE examination show it was primarily, if not solely, a forensic examination and statements provided therein by C.E. were thus not for purposes of medical treatment. The proposed testimony does not satisfy an exception to the hearsay rule. Moreover, the statements were testimonial and inadmissible under the Confrontation Clause.

    B. Factual Background

        1. *C.E. arrived and demanded a SANE examination*

C.E. arrived at the SJRMC at approximately 6:00 p.m. on May 20, 2014.[2] When she arrived, she admitted to recent consumption of alcohol and exhibited outward signs of intoxication. (Her blood alcohol content after her arrival was measured at nearly four times the legal limit - .298). C.E. immediately informed SJRMC staff she had already reported her allegations to law enforcement and she was "[h]ere asking for SANE exam." Moreover, the initial "medical" examination did not support her allegations. For instance, while C.E. claimed

---

[1] Defendant Russell is prepared to present the relevant records and reports at any hearing on this matter. In the interest of preserving the privacy of C.E., they are not attached to this public pleading.

[2] According to discovery provided, C.E. was no stranger to SJRMC. She was previously seen there in regards to different assault allegations, and also treated for alcohol use and abuse. On July 18, 2016, counsel for Defendant submitted a formal request for additional discovery relating to C.E.'s prior allegations of assault and unique medical history. Said discovery was expected to provide potential alternative suspects and alternative explanations for her alleged injuries, and is thus material to the preparation of the defense. On December 5, 2016, counsel received a compact disc mailed on November 29, 2016, containing approximately 700 pages of the requested records which appeared to have been prepared for the Government several months earlier. This production represents a portion of the records requested.

to have been brutally attacked, kicked and choked, staff at the SJRMC noted C.E. had only "some minor contusions…but nothing severe." Although she claimed to have been choked severely, the attending physician noted there was no evidence of "intra-thoracic, intra-abdominal or intra-pelvic injuries," and C.E.'s neck showed no signs of tenderness "to palpation."

Regardless, during the evening and into the night, SJRMC staff conducted tests, including a pregnancy test, and provided C.E. with pain medication and associated anti-nausea medication. While she was eventually admitted for observation, her charts very clearly indicate "No, this is not a trauma patient." In other words, there was no acute or ongoing medical need – other than perhaps her need to detoxify.

    2. *The SANE examination not for medical purposes*

Shortly after midnight on May 22, 2014, Susan Eldred with the Sexual Assault Services of North West New Mexico ("SAS") arrived to conduct the SANE examination C.E. demanded. Eldred waited while SJRMC staff completed conducting tests and providing any potential remaining care associated with other medical concerns. The SANE examination began between 1:00 a.m. and 2:00 a.m. the following morning.

The SANE examination conducted by Eldred was almost entirely a forensic examination for the purpose of collecting evidence, including testimonial statements, for use in a future prosecution. This is apparent based on the circumstances of the examination, the documentation of the examination, and the lack of medical assistance offered to C.E. by Eldred on May 22, 2014.

    i. Circumstances of the SANE examination

C.E. arrived at the SJRMC and stated she was present for a SANE examination and the matter had already been reported to the Shiprock Police Department. Under the circumstances, it

3

appears likely that law enforcement directed her to obtain a SANE examination. Regardless, records provided in discovery indicate C.E. continued to demand a SANE examination, so much so that records state she was "emphatic" about obtaining one. Clearly, her primary purpose in appearing at SJRMC was for purposes of evidence collection rather than medical treatment. This is particularly apparent when it comes to Eldred's involvement.

By the time Eldred saw C.E., any activity that *might* be termed "medical treatment" was well under way. C.E. was under the care of a medical doctor, Dr. Dwayne Gibbs, was receiving pain medication, had undergone several tests (including a pregnancy test and scans for her alleged injuries), was being "cared" for by SJRMC nursing staff, and had already been directed to psychological counseling services for after care. In this context, Eldred was instructed doctors would not make C.E. available for a SANE examination until other matters were finished, presumably because Eldred's forensic examination would interfere with any actual medical treatment, in particular as it relates to chronic ailments.

By the time Eldred became involved, there simply was no medical reason for her attention. The only reasonable conclusion is that Eldred's SANE examination was primarily (if not solely) for purposes of collecting evidence and testimonial statements from C.E. *See e.g. State v. Carmona*, 2016-NMCA-050, ¶38, 371 P.3d 1056, 1065 (finding lack of need for emergency medical treatment suggested SANE examination was conducted for a testimonial purpose). Eldred's documentation of her examination shows this to be true.

The consent form provided by Eldred to C.E. highlighted the forensic basis for the examination. In it, C.E. was notified the examination was for purposes of "documentation of injury, collection of reference standards as well as foreign DNA and trace evidence." She was further notified that, even if no police report were filed, "a case number will be assigned to

*maintain preservation and transference of evidence*." (Emphasis added). C.E. necessarily knew the examination was to provide evidence because, by executing the waiver, she agreed "to release all records and evidence pertaining to this case *to the pertinent law enforcement agency and crime lab*" and prosecutorial authorities. (Emphasis added). Under these circumstances, there is no doubt that both Eldred and C.E. expected the examination would "go to the issue of whether Defendant [assaulted C.E.], and therefore reflect directly on Defendant's guilt or innocence" such that it was primarily for purposes of gathering evidence rather than for medical treatment. *See e.g. Carmona*, 2016-NMCA-050, ¶38, 371 P.3d at 1065 (finding SANE examination with kit was primarily to create evidence for use in future prosecution).

        ii.       The forensic nature of the examination

There are numerous further indications that the examination itself was primarily forensic rather than for purposes of medical care. Initially, the "SANE Intake" portion of the report contained a significant portion dedicated to law enforcement information. A Shiprock Police Department case number was already listed, as the name of an officer associated with the investigation was already provided. The intake form uses language indicative of a police investigation rather than a medical examination, such as referring to the "Offender."

Similarly, the "Related Medical History" is geared towards gathering evidence rather than developing a true medical history for purposes of providing treatment. There is a large section for "Patient Post-Assault Hygiene Activity" with 19 separate questions designed to determine if evidence can be collected or if it has potentially been removed by hygienic activities. Another large portion of the "Related Medical History" does not even address the patient's history, but rather is dedicated to "Offender Information." This accusatory and investigatory language is replete throughout the full report, including the "Summary of Acts

Described by Patient" portion, which also often refers to the "offender" and includes questions designed to determine the potential availability of DNA evidence (e.g. whether there was touching, licking, kissing, ejaculation).

There are portions of the Eldred's form report that give up any pretense of connection to medical concerns also. In the section entitled "SANE Clothing Information," there is a fill-in-the-blank portion indicating "Law Enforcement Officer _____ was notified by SANE _____ at (time): _____" as to the "location of clothing worn at the time of the assault." This is not the language of a medical provider concerned with diagnosis and treatment. It is the language of an investigator concerned with gathering and preserving evidence for use in a potential prosecution.

The physical examination itself further highlights the fact that the primary purpose of the examination was to gather evidence and testimonial statements. For instance, Eldred never inquired as to a full and meaningful medical history as any reasonable medical professional would have in order to properly diagnose and treat a patient that appeared with multiple contusions. In particular, a medical professional *truly* concerned with medical treatment would have sought further information because the contusions very clearly show signs of various stages of healing, indicating they may be the result of multiple causes over a period of time. If a *true* medical history was obtained, Eldred no doubt would have documented – as other medical professionals did in relation to this incident – that C.E. had a history of anemia issues and liver disease associated with alcohol abuse. After all, any medical professional would know that anemia and liver disease would affect how a patient would project.

Other portions of the documentation of the physical examination also show it was for purposes of documenting evidence, not providing medical treatment. For instance, Eldred's

6

standard form had portions to document the presence of things such as "environmental debris", "fingernail evidence" or other "miscellaneous evidence." There were also portions to document alleged injuries without any reference to possible treatment for injuries, including a "SANE Strangulation Documentation"[3] and "Foot Injury Documentation."

        iii.    "Discharge" and "Evidence Collection"

More evidence of the SANE examination's true purpose appears in the "discharge" paperwork and the "Checklist" Eldred used to conduct the examination. There is nothing substantial within the "discharge" instructions concerning any medical concerns that were not already addressed by SJRMC prior to Eldred's arrival and involvement. Moreover, Eldred would have known that any actual medical concerns were already addressed because she had been in contact with the physicians and nurses prior to the examination. She knew a pregnancy test was negative and also knew C.E. "had tubal ligation" previously. She further had been informed that C.E. was already receiving pain and other medications, such as anti-nausea pills, from providers at SJRMC.

Furthermore, the discharge paperwork contains direction to C.E. concerning a potential prosecution. It informed C.E. that "evidence has been collected" and provided her with the contact information for "Shiprock PD" contact "Jerrick Curley" with a corresponding case number. (Upon information and belief, Curley is an investigator with the Bureau of Indian

---

[3] The use of the "Strangulation Documentation" form is particularly telling because a medical doctor previously informed Eldred that C.E. was checked for injuries related to alleged strangulation, but that she did not exhibit any "signs or symptoms of asphyxiation injury." An M.D. had already examined C.E. on this specific alleged medical issue and determined there were no injuries, yet Eldred "documented" strangulation injuries. This suggests not only that the examination was for forensic rather than medical purposes, but also that Eldred's examination may be tainted by bias such as that discussed by the Supreme Court in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).

Affairs involved in the prosecution of this matter).

II.   ARGUMENT

    A.  Proposed Testimony Does Not Satisfy Fed. R. Evid. 803(4)

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement and is generally inadmissible. Fed. R. Evid. 801(c). The Government admits the proposed testimony concerning C.E.'s out-of-court statements are offered to prove the truth of the matters asserted therein because it proposes that Eldred testify her observations are "consistent with the version of the events that were provided by [C.E]." (Doc. 76, p. 2). This proposed testimony is clearly hearsay and subject to exclusion if the Government fails to meet its burden of establishing that a valid exception applies. *United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012).

The defense anticipates the Government will seek to have the proposed testimony admitted under Fed. R. Evid. 803(4) as statements for purposes of medical treatment. The Federal Rules of Evidence permit the admission of hearsay evidence provided the hearsay involves statements "made *for* – and [ ] reasonably pertinent to – medical diagnosis or treatment." Fed. R. Evid. 803(4) (emphasis added). The medical purpose exception is premised on the idea that an individual seeking medical treatment is likely to be truthful to their physician because they know, in theory, that the success of their medical treatment depends on the accuracy of the information they provide to the medical provider. *United States v. Joe*, 8 F.3d 1488, 1493 (10th Cir. 1993); *see also White v. Illinois*, 502 U.S. 346, 356 (1992)("a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility."). Because this selfish motive is the very basis of the exception, in order to satisfy the hearsay

exception, C.E. must have been motivated by an attempt to procure "medical diagnosis or treatment," not to assist in an investigation and/or prosecution. *United States v. Wright*, 340 F.3d 724, 732 (8th Cir. 2003); *but cf. Joe*, 605 F.3d at 1494, n. 5. In this case, an examination of the circumstances highlights two insurmountable problems with admitting the alleged victim's statements as statements for purposes of medical treatment: (1) the statements were not given for purposes of treatment; and (2) statements to medical professionals by *this* particular individual have proven to be unreliable.

   1. *Statements were for purposes of law enforcement not medical treatment*

When viewed in proper context, it is obvious that C.E. was not motivated by a desire for medical diagnosis and treatment and Eldred did not, in fact rely on her statements for diagnosis and treatment. Rather, Eldred conducted the SANE examination with the primary purpose of documenting and preserving evidence for prosecution.

A highly-intoxicated C.E. made it very clear from her arrival on that her motive was to provide evidence of the alleged assault against her. She knew the process, having previously made allegations of assault, and thus was aware of the reasons to collect evidence through a SANE examination.

At the same time, Eldred did not actually provide medical diagnosis or treatment. This is apparent from an examination of the available evidence. Initially, it appears very likely that Eldred utilized the standard New Mexico SANE kit, or something very similar thereto. New Mexico courts have examined the purpose of SANE kits in this context, and have determined the primary purpose of examinations based thereon is collecting evidence and not medical treatment. *Carmona*, 2016-NMCA-050, ¶38, 371 P.3d at 1065. The examination by Eldred appears no different.

Further evidence that the SANE examination did not have a legitimate medical purpose is contained within the "Checklist & Summary of the Sexual Assault Evidence Collection and Exam Procedures" completed by Eldred outlining her examination. (The title of the document itself places "Evidence Collection" before "Exam Procedures" in a manner that signifies the true purpose). Eldred's "checklist" contained twenty (20) potential tasks for her to complete. Of those twenty, fifteen (15) were solely related to evidence collection. For instance, the more important last steps include sealing evidence so that "Chain of Custody is maintained throughout." These are obviously not tasks that a medical doctor truly interested in diagnosis and treatment would place above actual health concerns.

Furthermore, the few tasks on the checklist that were not explicitly for the collection of evidence for use in a potential prosecution are often used for that purpose eventually. For instance, one task (which Eldred did not actually ever perform) was a pregnancy test. If Eldred had actually conducted a pregnancy test and it was positive, there is no doubt the prosecution would use it as evidence.[4] The same can be said for testing for sexually transmitted diseases. If an alleged victim tested positive, the information would no doubt be used in a prosecution. However, it was not developed in this case because, amazingly, the "checklist" specifically directed Eldred to avoid diagnosis and treatment because, according to the checklist, "STI testing is *not* recommended for adults." (Emphasis in original).

*If* the purpose of the examination was medical diagnosis and treatment, Eldred would

---

[4] It is important to note that, in this case, Eldred did not conduct a pregnancy test and apparently provided no emergency contraception. These two items are some of only a handful that are arguably primarily medical rather than evidentiary, and yet Eldred ignored them. While she may have avoided them because a pregnancy test was already administered, even this fact highlights that any medical concerns were already addressed and the involvement of Eldred was forensic, not medical.

10

absolutely *not* avoid testing that would assist in diagnosing and treating medical issues.  In fact, there is no evidence that Eldred legitimately attempted to diagnose or treat C.E.  To the contrary, it appears Eldred avoided tried-and-true standard diagnosis and treatment procedures.  This reinforces that her involvement was in no way connected to any medical emergency such as *might* provide some support for admission of the proposed testimony.  *See Carmona*, 2016-NMCA-050, ¶38, 371 P.3d at 1065 (lack of medical emergency supports finding that SANE evidence was testimonial).

For instance, while "[n]o one doubts the utility of medical histories" to assist medical professionals in diagnosing, Eldred made no effort to obtain a full medical history.  In fact, the section for "General Medical History" on her form is minimal in comparison to the portions of the report related to evidence gathering.  (It consists of less than three full lines of space for the examiner to detail a medical history).  The complete lack of a legitimate medical history is apparent because Eldred's "history" included brief mentions of only four prior medical issues despite the fact that the "patient" was known to have serious chronic medical problems that do not garner any mention.  This is particularly shocking in this case because, while much of the report is dedicated to documenting alleged bruises, there is no mention of C.E.'s history of anemia and advanced chronic liver disease.  Any legitimate medical professional would know these two ailments in particular lead to bleeding and clotting issues that would affect how a patient with bruising would be interpreted for diagnosis and treatment.

Differential diagnosis, the process by which medical professionals consider and rule out potential medical causes when they are *actually* interested in diagnosis and treatment, requires a full medical history, clinical tests, laboratory tests, physical examinations, etc., and not just gathering of soiled clothes and pictures of bruises.  *See Magistrini v. One Hour Martinizing Dry*

*Cleaning*, 180 F.Supp.2d 584, 609 (D.N.J. 2002); *Guinn v. Astra Zeneca Pharmaceuticals LP*, 602 F.3d 1245, `154 (11th Cir. 2010)(reliable diagnosis requires the consideration of possible alternative causes based on the facts of the case because "temporal proximity is generally not a reliable indicator"); *McCann v. Metabolite Intern. Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005)("No one doubts the utility of medical histories in general or the process by which doctors rule out some known causes of disease in order to finalize a diagnosis."); *Alexander v. Smith & Nephew PLC*, 98 F.supp.2d 1287, 1292-94 (D. Ok. 2000)(discussing proper medical diagnosis technique).

From a medical standpoint, Eldred's lack of interest in developing an accurate medical history would be malpractice *if* Eldred was truly acting to diagnose and treat the "patient." In the context of this investigation, it is unsurprising since Eldred was *not* interested in diagnosis and treatment. She was instead interested in gathering evidence. Her participation was as an investigator, not as a medical provider.

The examination was not for medical purposes and none of the evidence associated therewith can satisfy the hearsay exception contained within Fed. R. Evid. 803(4). The proposed testimony should be excluded. *See United States v. Tome*, 61 F.3d 1446, 1451 (10th Cir. 1995)(statements did not satisfy Fed. R. Evid. 803(4) because recipient did not treat the declarant).

> 2.  *The basis for the medical exception is proved inapplicable to this "patient"*

As stated above, the medical purpose exception is premised on the idea that an individual seeking medical treatment is likely to be truthful to their physician because they know, in theory, that the success of their medical treatment depends on the accuracy of the information they provide to the medical provider. *United States v. Joe*, 8 F.3d 1488, 1493 (10th Cir. 1993); *see*

*also White v. Illinois*, 502 U.S. 346, 356 (1992)("a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility."). While, generally, this may be true, as to this particular alleged victim, a candid review of her medical history exhibits a pattern of knowingly providing inaccurate, if not false, information to medical professionals when purportedly seeking medical treatment for various maladies, such as those associated with her methamphetamine use and high-risk lifestyle. This is particularly problematic when, as in this case, she appeared at the San Juan Medical Center while highly intoxicated.

For instance, on July 16, 2013, the alleged victim appeared at the San Juan Regional Medical Center complaining of a "physical assault by a [*sic*] unknown person" with additional old injuries, and was found to have a blood alcohol level of .444 – a potentially fatal range. On that evening, she provided a "history" to medical personnel in which she "denies drinking on a regular basis" – a statement which is very clearly false as the level of regular alcohol intake and associated built-up tolerance required for an individual to even approach a blood alcohol level of .444 while remaining ambulatory and able to speak is staggering to the mind.

The alleged victim was further dishonest with medical personnel in October 2015, when she appeared at least twice complaining of abdominal pain associated with alcoholic cirrhosis. Although upon first arrival, she indicated she did not drink alcohol or use narcotics, later that month it was documented that she uses "methamphetamine and marijuana." During October 2015, she also falsely informed medical personnel that she had a positive drug screen because "her sister blew smoke in her face." Less than two months later she again was noted in other records as using methamphetamine and marijuana.

At the same time, the patient has a history of presenting for medical "treatment" while

under delusion. For instance, in March 2016, she appeared at the San Juan Regional Medical Center claiming to have been "bit by a spider…. On my nephew" and claiming she did not use illicit drugs. (Her methamphetamine issues were already documented).[5]

The alleged victim in this matter has proven that any presumption of reliability generally attached to statements to medical personnel cannot appropriately be applied to herself. Accordingly, the justification for admission of the statements is inapplicable in this case. Under the circumstances, the Court should prohibit their introduction into evidence.

B. The Proposed Testimony Violates the Right to Confrontation

Further justification for excluding the proposed testimony is found within the Confrontation Clause because C.E.'s statements amounted to testimonial hearsay. *See Crawford v. Washington*, 541 U.S. 36 (2004); *Davis v. Washington*, 547 U.S. 813 (2006); *United States v. Melendez-Diaz*, 557 U.S. 305 (2009). A statement is testimonial and subject to mandatory cross-examination under *Crawford* if it was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz*, 557 U.S. at 311. A statement is testimonial when "the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution" or when "the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime." *United States v. Smalls*, 605 F.3d 765, 778 (10th Cir. 2010).

For the reasons set forth above, there is little doubt that C.E. intended to provide

---

[5] Defendant has requested further medical records of the alleged victim, but, as of the filing of this motion, has only received such records from a single facility – the San Juan Regional Medical Center.

information "for use in the investigation or prosecution of a crime" and to "establish or prove some fact potentially relevant to a criminal prosecution." This is further evidenced by the facts discussed herein that show the SANE examination was primarily to gather evidence rather than provide medical treatment. There was no longer any immediate medical concern or emergency which must be addressed. C.E.'s statements were intended simply to describe and document alleged past events. This is precisely the type of testimony the Confrontation Clause was designed to exclude. *See Davis*, 547 U.S. at 828 (differentiating between non-testimonial hearsay describing current events from testimonial hearsay from *King v. Brasier*, 1 Leach 199 (1779), in which an alleged victim recounted "the circumstances of the injury" to another after the fact). The testimonial nature of such a forensic interview is not altered simply because there might also be some tangential purpose attached to the interview, *see United States v. Bordeaux*, 400 F.3d 548, 556 (8th Cir. 2005), or because C.E. provided the statements voluntarily. *See Meledez-Diaz*, 557 U.S. at 316 (Confrontation Clause applies equally to voluntary testimonial offerings as it does to "interrogation"); *see also Hernandez v. State*, 946 So.2d 1270, 1283-84 (Dist. Ct. App. Fl. 2007)(statements to nurse were "functional equivalent of a police interrogation" even if also had possible medical purpose).

      Defendant's confrontation rights should not be brushed aside through "creative use" of the rules of evidence. C.E.'s statements to Eldred were testimonial and cannot be admitted. Any other conclusion would ignore the modern realities of sexual offense investigations and the role of "SANE examiners" as *de facto* extensions of law enforcement, *Hernandez*, 946 So.2d at 1283-84, and allow the state to perform an end-around key constitutional protections by simply outsourcing vital parts of the investigation.

## POSITION OF THE GOVERNMENT

Counsel for Mr. Russell has contacted Assistant United States Attorneys Kyle Nayback and Joseph Spindle concerning this Motion and the relief requested herein, and Mr. Nayback indicates the United States objects to the relief requested herein.

WHEREFORE, the Defendant Melvin Russell, respectfully requests this Court exclude the proposed testimony of Nurse Susan Eldred concerning any statements made to her.

Respectfully submitted:

ROTHSTEIN DONATELLI LLP

By: <u>/s/ Mark H. Donatelli   December 12, 2016</u>
MARK H. DONATELLI
PAUL M. LINNENBURGER
1215 Paseo De Peralta
P.O. Box 8180
Santa Fe, NM  87504-8180
(505) 988-8004
(505) 982-0307 (Fax)
*Attorneys for Defendant Melvin Russell*

**CERTIFICATE OF SERVICE**

   I HEREBY CERTIFY that on the 12th day of December, 2016, I filed this pleading electronically through the CM/ECF system, which caused the following counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Kyle T. Nayback
Assistant U.S. Attorney
U.S. Attorney's Office
District of New Mexico
P.O. Box 607
Albuquerque, New Mexico 87103
Email:  kyle.nayback2@usdoj.gov

Joseph Michael Spindle
Assistant U.S. Attorney
U.S. Attorney's Office
District of New Mexico
P.O. Box 607
Albuquerque, New Mexico 87103
Email: Joseph.Spindle@usdoj.gov

        */s/ Mark H. Donatelli   December 12, 2016*
        ROTHSTEIN DONATELLI LLP